UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GRUPO ANTOLIN MICHIGAN,
a Michigan corporation,

    Plaintiff,

v.                                    Case No.:  2010-
                                       Hon.

MILLIKEN & COMPANY,
a Delaware corporation,

    Defendant.
_____/
JEFFREY L. HUDSON (P31808)
Dean & Fulkerson, P.C.
Attorney for Plaintiff
801 W. Big Beaver, 5th Floor
Troy, MI  48084
(248) 362-1300
jhudson@dflaw.com
_____/

## COMPLAINT

NOW COMES Plaintiff, Grupo Antolin Michigan, by and through its attorneys, and for its Complaint against Milliken & Company states as follows.

## OVERVIEW

Grupo Antolin is a supplier to the automobile industry.  From 2008 through the present, Grupo Antolin purchased component parts (Halo boards, a natural fibre thermoplastic composite) from Milliken & Company.  The boards proved to be defective.  At first, Milliken acknowledged the problems and agreed to rejections and setoffs, but then repudiated these agreements and course of dealing.  In March 2010, Milliken notified General Motors and Grupo Antolin that it had decided to "exit" this portion of the

automotive industry. Milliken thereupon demanded immediate payment of all Grupo Antolin deductions and threatened to shut off manufacture and deliveries to Grupo Antolin. This would have shut down and caused catastrophic injury to Grupo Antolin and its customer, General Motors. Grupo Antolin repaid the money under protest and has brought this action for breach of contract, breach of warranties and other claims to recover the money paid and for money damages. Grupo Antolin seeks damages in excess of $700,000.

1. Parties:

   a. Plaintiff: Grupo Antolin Michigan ("Grupo Antolin") is a Michigan corporation with its principal offices located at 6300 Euclid Street, Marlette, Sanilac County, Michigan. Grupo Antolin is a tier-1 supplier to the Original Equipment Manufacturers in the automotive industry.

   b. Defendant: Milliken & Company ("Milliken") is a Delaware corporation. Its principal offices are located in Spartanburg, South Carolina. Milliken is registered and authorized to do business in the State of Michigan. Its Michigan registered office is located at 30600 Telegraph Road, Ste. 2345, Bingham Farms, Oakland County, Michigan 48025. Milliken is engaged in the manufacture and sale of textiles and other products. It sells (or sold) its goods to tier-1 suppliers in the automotive industry.

2. Jurisdiction and Venue: This Court has subject matter jurisdiction over Grupo Antolin's claims pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs and the action is among citizens of different states.

Venue is proper in this district under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of the defective goods that are the subject of this action are situated in this District.

## COUNT I

## DECLARATORY JUDGMENT

3.      <u>Milliken Develops Halo:</u>  In and around 2007 Milliken was in the process of developing certain natural fiber thermoplastic composite material boards it sought to sell to the Original Equipment Manufacturers ("OEMs") in the automotive industry.  Milliken sought to and finally did sell the boards under the trade or marketing name of "HALO" or "HALO Boards."  This material and the boards were developed by Milliken directly with General Motors Corporation.  Milliken represented to General Motors that its advanced nonwoven technology (after processing including heating, etc.) would achieve a performance level comparable or which exceeded fiberglass reinforced panels or other competitive products.  Pursuant to Milliken's desire to become an approved supplier of this material and the boards to General Motors, Milliken provided General Motors with samples and test results.  Milliken developed and pursued this business directly with General Motors and had direct influence and agreements as to the products' specifications and performance.  It is these product specifications and performance requirements that Milliken was unable to ultimately meet and which is the partial subject of this action.

4.      <u>Request for Quote:</u>   In 2007, Grupo Antolin submitted to Milliken a Request for Quote ("RFQ") for the thermoplastic composite boards.  These boards were

to be incorporated by Grupo Antolin into headliner systems it was selling to General Motors (for installation by General Motors into its vehicles.) Headliner systems line the interior roof of a car's passenger compartment. General Motors told Grupo Antolin it should use Milliken as a supplier for the boards.

5. <u>Purchase Order:</u> In November 2008 Grupo Antolin issued to Milliken a Purchase Order dated November 11, 2008 for the Halo boards. A copy of the Purchase Order is attached as Exhibit A. (The Purchase Orders are sometimes referred to herein simply as the "Agreement."). The size of the boards was 61 x 97 and the price for each was $19.62.

The front of the Purchase Order incorporated the "General Purchasing Terms" located on the reverse side of the Purchase Order. These terms included, but were not limited to the following:

- <u>Objection to different or additional terms:</u> Paragraph 1 provided:

  **AGREEMENT: This Purchase Order is an offer for the purchase of goods or services specified on the face of this purchase order. Any acceptance of this offer by Seller shall be an acceptance of all of the terms and conditions of this offer notwithstanding that Seller's expression of acceptance states additional or different terms from those in this offer or that Seller's acceptance is conditioned upon Buyer's assent to such additional or different terms. To the extent that Seller's acceptance states different or additional terms, Seller is notified that Buyer expressly objects to those different or additional terms. Acceptance shall include the receipt of Seller's written acknowledgment of this offer, commencement or work, performance of services or shipment of goods.**

  This purchase order, together with any specifications, drawings, designs, change orders, OEM purchase order (per paragraph 9 below) purchase order releases, Buyer's additional terms and conditions as maintained on its website and any amendments that are accepted and signed by the parties represent the entire agreement between the parties and can not be changed without

4

Buyer's written consent.  This purchase order supersedes any previous oral or written communications, including provisions in Buyer's request for quotes, Seller's quotations, proposals, acknowledgments or other documents.  All modifications relating to this purchase order shall be in writing, signed by Buyer.

- Quality and Inspection:  Payment for goods shall not constitute acceptance thereof.  Buyer reserves the right to inspect goods during manufacturing and within a reasonable time after delivery, but such inspection does not relieve the Seller of his obligations to deliver conforming goods.  Buyer shall have the right, in its sole discretion, to reject goods that are defective or non-conforming. Goods so rejected as well as goods supplied early, late, in incorrect quantities or that are incorrectly labeled may be returned to Seller at its expense and, in addition to Buyer's other rights, Buyer may charge Seller all expenses of unpacking, examining, repackaging, and re-shipping such goods.  If Buyer receives goods whose defects or nonconformity is not apparent on examination and this results in damage to other goods, materials, equipment, or otherwise, Buyer reserves the right to require replacement of such goods, materials, etc. as well as reimbursement for all damages incurred by Buyer. Seller shall be responsible for any additional cost incurred by Buyer or any customer of Buyer as a result of Seller's delivery, quality, incorrect packaging or shipment quantities.

    . . .

    (b)  Seller acknowledges that it assumes all responsibility for ensuring, at its sole cost, that all testing and analysis as is needed to meet QS9000 requirements or any other quality certification standards that Buyer's customers or Buyer requires on parts, components, materials, systems and processes incorporating or involving any product sold by Seller to Buyer hereunder will be properly completed and satisfied, whether or not Seller is or has been certified as meeting each certification requirements apart from this Purchase Order.

- Warranty:  In addition to the warranties provided for in the purchase order, Seller represents and warrants to Buyer  as follows:  (a) the Goods strictly conform with the specifications, drawings, instructions, advertisements, statements on containers and labels, descriptions and samples furnished or specified by Buyer, its customer or Seller; (b) the Goods are free from defects in workmanship and material and shall be new and of the highest quality and the Goods are merchantable; (c) the Goods and materials comprising the Goods are genuine in all respects; (d) Seller acknowledges that it knows of Buyer's intended use of the Goods and that Buyer is relying on the Seller's skill and judgment to provide Goods

5

that will be safe, fit and provide proper functionality for Buyer's intended use; . . . (h) that Seller will cure, by repair, replacement or otherwise as necessary (but will only replace Goods upon receipt of Buyer's advance order to do so), any breach of warranty occurring during the warranty period (whether due to defects in the Goods or due to or arising out of any statement in this Warranty Section being untrue or misleading at any time during such warranty period; and (i) the warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers (or end users of vehicles), such longer period shall apply. Such warranties shall survive inspection, test, delivery, acceptance, use and payment by Buyer and shall insure to the benefit of Buyer's successors, assigns, customers and other users of Buyer's products. Notwithstanding any other provision, and without waiving any of Buyer's remedies, in the event of defective goods or services, Buyer may, in its discretion, immediately repair or replace the defect and hold Seller responsible for all attendant costs or damages.

- <u>OEM Requirements:</u>  Seller shall comply with the terms and conditions of any purchase order or other agreement received by Buyer from a third party (which is referred to herein as "OEM Customer") and which purchase order or other agreement referred to herein as "OEM Purchase Order" whereby Buyer agrees to supply to the OEM Customer, or incorporated into goods supplied to OEM Customer, goods or services. Buyer may, from time to time, supply Seller with information regarding OEM Purchase Orders, but, in any event, Seller shall be responsible for ascertaining any terms or conditions contained in the OEM Purchase Orders that may affect Seller's obligations hereunder.  Without restricting the foregoing, Seller shall take such steps, provided such disclosure and do all things as may be necessary or desirable and within its control to enable Buyer to meet Buyer's obligations to OEM Customers under OEM Purchase Orders.  In the event Buyer reduces its price for goods or services during the terms of this purchase order, Seller simultaneously shall reduce its prices for its component, goods or services correspondingly.  If there is any conflict between this paragraph and any other paragraph of this order, Buyer shall have the right to have the provisions of this paragraph prevail.  Seller agrees to cooperate with Buyer and Buyer's OEM Customer in the event of any dispute.

- <u>Indemnity:</u>  Seller shall indemnify, defend, and hold harmless Buyer, its affiliates, directors, officers, employees, agents and customers from and against any loss, liability, costs, expenses (including reasonable attorney fees), suits, actions or damages, directly or indirectly arising out of or relating to: (a) its failure, violation, default or breach of any warranty, representation, covenant or agreement made in this purchase order by Seller; (b) injuries, death, disabilities or damages to property owned by Seller, is employees, agents and subcontractors or that are in any way

- attributable to the performance of Seller; and (c) other suits, claims or actions all as more fully set forth in Buyer's administrative procedures, hereby incorporated by reference.

- Remedies:  Buyer's remedies shall be cumulative and remedies specified herein do not exclude any remedies allowed in law or equity.  Waiver of any breach shall be specified in writing by Buyer's authorized representative and shall not constitute waiver of any other breach of the same or other provision.  Acceptance of any terms or payments therefore shall not waive any breach.  Non-assertion of a known breach does not constitute a waiver of same.  In addition to any right of set off provided by law, Buyer may assert against this purchase order all amounts due to Seller or its affiliates from Buyer or its affiliates.

- Governing Law and Choice of Forum:  This agreement shall be construed and governed in accordance with the internal laws of the State of Michigan, including the Uniform Commercial Code, without regard to conflict of laws provision.  The U.N. Convention on Contracts for the International Sale of Goods shall not apply.  Any litigation between Seller and Buyer relating to the goods or services or the terms of purchase order shall be brought only in the United States District Court for the Eastern District of Michigan or in a state court located within the State of Michigan.

6. Acceptance:  The above Purchase Order, including Grupo Antolin's General Purchasing Terms, was accepted by Milliken.  Milliken thereafter began to produce boards pursuant to the Purchase Order and its General Purchasing Terms.

7. First Production Shipments:  During the first part of 2009 Milliken manufactured Halo boards and began shipping against the November 2008 Purchase Order and its General Purchasing Conditions.

8. May 14, 2009 Purchase Order:  On or about May 14, 2009, the amount of adhesive on the boards was changed and the price per board was changed to $18.58 per board.  A copy of the May 14, 2009 Purchase Order is attached hereto as Exhibit B and incorporated by reference.  It had the same General Purchasing Conditions as the original Purchase Order.

9. <u>Production Shipments</u>: On or after May 14, 2009, Milliken began to manufacture the boards and thereafter shipped them pursuant to the May 14, 2009 Purchase Order and its General Purchasing Conditions.

10. <u>September 1, 2009 Purchase Order</u>: On or about September 1, 2009, the size of the board was changed from 61" x 97" to 56" x 98" and the price of the boards was changed to $17.89 per board. Grupo Antolin issued a Purchase Order dated September 1, 2009 to this effect. A copy of the Purchase Order is attached as Exhibit C and incorporated by reference. The Purchase Order had the same purchasing conditions as the original Purchase Order.

11. <u>Production Shipments</u>: On or after September 1, 2009 Milliken manufactured the boards and began shipping against the September 1, 2009 Purchase Order and its General Purchasing Conditions.

12. <u>Defects and Rejections</u>: The subject Halo boards were manufactured and intended by Milliken to be heated, trimmed and processed into headliner components. As the boards began to be processed by Grupo Antolin at its Marlette, Michigan facility, Grupo Antolin noticed a number of defects in the boards. The boards were not in compliance with the terms, specifications and conditions of the Purchase Order. The disbursement of the fibers within the boards was inconsistent and the defects associated with the boards became apparent, particularly upon being processed. The defects included, but were not limited to, surface bumps, strength and rigidity problems (sometimes referred to as toughness and stiffness problems).

13. <u>Notice</u>: At all relevant times Grupo Antolin put Milliken on timely and proper notice of the defective boards. These notices were made both orally by Grupo

Antolin employees to Milliken as well as in writing. The written notice of defects and rejections were made in e-mails between the parties, replaced with "non-conformity" reports (DMR's), charts, and test results. There were many meetings at Grupo Antolin's Marlette facility with respect to the defects during which time the defective panels were inspected by, reviewed and discussed with Milliken. It is estimated that approximately 20% to 25% of the boards were defective.

14. <u>GM Build Issue Rejections:</u>  On and after March 9, 2010, GM started rejecting Grupo headliners because Milliken's boards were defective and did not meet specifications. This information was likewise transmitted by Grupo Antolin and/or General Motors to Milliken.  In addition to meetings between Grupo Antolin and Milliken, upon Grupo Antolin's information and belief, there were numerous meetings between General Motors and Milliken with regard to Milliken's defective boards.

15. <u>Course of Dealing:</u>  During this time period Grupo Antolin and Milliken had numerous meetings and it was agreed that between Grupo Antolin and Milliken that an inspection company would be hired at Milliken's expense to inspect the boards as they were processed at Grupo Antolin's Marlette facility. It was also agreed between Grupo Antolin and Milliken that deductions would be charged to Milliken for the costs of the inspection and rejections of the defective boards. The deductions made by Grupo Antolin during this period were approved and ratified by Milliken up through and until April 23, 2009.

16. <u>Milliken Decides to Exit Auto Industry:</u>  It has been asserted by Milliken that Milliken invested more than $20 million dollars to launch the Halo board project. When the boards proved to be defective in the industry, on or about March 22, 2010

9

Milliken notified General Motors of Milliken's intent to "exit" this portion of the automobile industry in 90 days.   Subsequently, Milliken so notified Grupo Antolin, a copy of which notification is attached hereto as Exhibit D, the relevant portions of which read:

> "Milliken & Company regrets to inform you of our decision to exit the natural fibre/propylene substrate market effective June 25, 2010.
>
> We have invested more than $20 million dollars to launch this product. After working diligently over the past eight years in advanced development and the last two years in production, we have determined that this product is not a commercially sustainable product moving forward. . ."

17.     <u>Milliken Discontinues Issuing Return Materials Authorizations (RMA's):</u>  On or about March 23, 2009 (the same day Milliken notified Grupo Antolin of its intention to exit this portion of the automobile industry), Milliken discontinued issuing Return Materials Authorizations (hereinafter "RMA's") for the defective and rejected boards and rescinded all previously issued RMA's going back to approximately March 9, 2010.

18.     <u>Written Assurance of Performance:</u>  On or about April 1, 2010, Grupo Antolin issued a letter to Milliken demanding a written assurance of performance.  A copy of the letter is attached as Exhibit E.

On or about April 6, 2010, Milliken's Jeff Stafford purportedly responded to the request.  A copy of the purported response is attached as Exhibit F.  In it, Milliken did not assure Grupo Antolin of performing Grupo Antolin's contract with Milliken, but rather asserted that Milliken's own Terms and Conditions and/or its own unilateral actions would control the relationship between the parties.  In Milliken's response, Milliken made various demands in direct contravention of both Grupo Antolin's Terms and Conditions as well as the previous course of dealing between the parties as to the

10

rejections for the boards, sorting of the boards and proper setoffs.  Milliken breached the agreement between the parties by failing to provide Grupo Antolin with a proper and/or timely assurance of performance and by repudiating the agreements between the parties and their course of dealing.

As to Milliken's demand, Grupo Antolin assured Milliken that it would perform its portion of the agreement between the parties and further discussions would be held as to the asserted dispute between them.

19.     <u>Dispute Resolution Meeting:</u>  On or about April 14, 2010, a meeting was held between the parties in Marlette, Michigan to discuss the dispute.  A further meeting was held between the parties on April 17, 2010 to review test data from Grupo Antolin's Marlette lab and to notify Milliken of Grupo Antolin having hired a neutral third party inspector, Gesquire, to test the boards.  Further meetings were held between the parties on or about April 21, 2010 and there was a more or less constant dialogue and e-mails between the parties throughout this time period with respect to the dispute.

20.     <u>Milliken's Unilateral Demands and Requirements:</u>  In April 2010, Milliken unilaterally and in bad faith demanded Grupo Antolin to immediately repay all of previously authorized deducted monies and not to surcharge Milliken for defects, sorting or other similar charges associated with the defective boards[1].  Otherwise, Milliken threatened to immediately stop delivery of the goods to Grupo Antolin.  This immediate shut down and failure to manufacture or deliver parts would have shut down and have caused catastrophic injury to Grupo Antolin and its customer General Motors by possibly shutting down its lines and affecting local economies and other suppliers to

---

[1] Milliken acknowledged certain setoffs for boards having "bumps", but Milliken refused to acknowledge during this period of time responsibility for other defects associated with the inconsistency of the boards including but not limited to the aforementioned issues concerning strength, rigidity and other issues.

11

General Motors. Under protest, Grupo Antolin acceded to Milliken's unlawful and wrongful demands. Thereafter, Grupo Antolin had to pay "cash before delivery" to obtain boards and was not permitted by Milliken to reject defective boards or to take proper deductions for them.

21.     <u>Further Breach:</u>  On and after May 6, 2010, Milliken began "short shipping" deliveries as well as tendering late deliveries, in further breach of Grupo Antolin's Purchase Order to Milliken.

22.     <u>Justiciable Controversy:</u>  A bonafide and justiciable controversy and dispute has arisen between these parties with respect to, among other disputes, the following:

- <u>Contract Terms:</u>  The terms and provisions of the contract between the parties, as modified by their course of dealing and standards in the automotive trade and industry.

- <u>Quality Issues:</u>  Quality of the Boards and Goods Provided by Milliken to Grupo Antolin

- <u>Rejections:</u>  Proper rejections of defective boards.

- <u>Setoffs:</u>  Proper setoffs, back charges or charges for sorting and/or inspection for the defective boards.

- <u>Breaches:</u> Breaches of the contract warranties and duties by and between the parties.

- <u>Damages:</u>  Damages and costs asserted between the parties.

23.     <u>Relief:</u>  Grupo Antolin requests the relief requested at the conclusion of this Complaint.

## COUNT II

## BREACH OF CONTRACT

24.    Incorporation:  Grupo Antolin incorporates the preceding allegations as if fully set forth herein.

25.    Contract:  The aforementioned Purchase Order and course of dealing between the parties constituted an enforceable contract between the parties for Milliken to manufacture and deliver the boards to Grupo Antolin in conformity with the specifications and requirements of the Purchase Order(s) and course of dealing between the parties, and for Milliken to otherwise comply with the standards in the trade and practices within the automotive industry.

26.    Breach:  Milliken has breached the contract between the parties as supplemented by their course of dealing and standards in the trade, including, but not limited to, the following:

- Assurance of Performance:  Milliken failed to assure performance to Grupo Antolin in a timely or proper manner.

- Defective Goods:  Milliken manufactured and delivered defective boards to Grupo Antolin.

- Misrepresentation:  Milliken misrepresented that the boards complied with the terms and specifications of the contract and requirements of General Motors.

- Requirements of OEM:  Milliken repudiated the requirements of General Motors as well as the standards in the industry (including QS9000 quality

standards) by manufacturing and delivering the defective boards to Grupo Antolin.

- <u>Breach of Good Faith and Fair Dealing</u>:  Milliken breached the covenant of good faith and fair dealing implied to all such commercial contracts by, among other things, its aforementioned acts and conduct.

- <u>Repudiations</u>:  Milliken breached the aforementioned agreement by, among other things, by virtue of the aforementioned breaches and repudiations.

- <u>Short Shipping and Late Deliveries</u>:  Milliken materially breached the agreement between the parties by its insufficient deliveries (i.e., "short shipping") as well as late deliveries.

27.   <u>Damages</u>:  In direct and proximate result of Milliken's breaches, Grupo Antolin has suffered damages including, but not limited to general damages, special and consequential damages, incidental damages, costs and attorney fees.

28.   <u>Relief</u>:  Grupo Antolin requests the relief requested at the conclusion of this Complaint.

## COUNT III

## BREACH OF EXPRESS WARRANTY

29.   <u>Incorporation</u>:  Grupo Antolin incorporates the preceding allegations as if fully set forth herein.

30.   <u>Express Warranties</u>:  In the Purchase Order Milliken agreed to the expressed warranties set forth therein and to produce boards that complied with the specifications.

31.	Breach:  Milliken has breached the expressed warranties between the parties all as more fully set forth above.

32.	Damages:  In direct and proximate result of Milliken's breaches, Grupo Antolin has suffered damages including, but not limited to general damages, special and consequential damages, incidental damages, costs and attorney fees.

33.	Relief:  Grupo Antolin requests the relief requested at the conclusion of this Complaint.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

34.	Incorporation:  Grupo Antolin incorporates the preceding allegations as if fully set forth herein.

35.	Warranty of Merchantability:  In its Agreement with Grupo Antolin, Milliken agreed to manufacture boards that were merchantable and were reasonably fit for the uses for which the boards were intended.

36.	Breach:  Milliken breached the implied warranty of merchantability between the parties in that many of the boards were defective and not fit for their ordinary uses for which they were intended, all as more fully previously set forth herein.

37.	Damages:  In direct and proximate result of Milliken's breaches, Grupo Antolin has suffered damages including, but not limited to general damages, special and consequential damages, incidental damages, costs and attorney fees.

38.	Relief:  Grupo Antolin requests the relief requested at the conclusion of this Complaint.

## COUNT V

## BREACH OF IMPLIED WARRANTY OF FITNESS AND/OR USE

39. <u>Incorporation</u>:  Grupo Antolin incorporates the preceding allegations as if fully set forth herein.

40. <u>Warranty of fitness for use</u>:  The agreement between the parties expressly provided that Grupo Antolin was relying upon Milliken's skill and judgment to provide goods that would be safe, fit and provide proper functionality for Grupo Antolin's intended use.

41. <u>Breach</u>:  Milliken breached the implied warranty of fitness of use in that the boards were not safe, fit or provided proper functionality for Grupo Antolin's intended use.

42. <u>Reliance</u>:  At all relevant times Grupo Antolin reasonably relied upon the skill and judgment of Milliken and upon Milliken's representations that the boards were fit for the uses intended.

43. <u>Damages</u>:  In direct and proximate result of Milliken's breaches, Grupo Antolin has suffered damages including, but not limited to general damages, special and consequential damages, incidental damages, costs and attorney fees.

44. <u>Relief</u>:  Grupo Antolin requests the relief requested at the conclusion of this Complaint.

## COUNT IV

## INDEMNITY

45. <u>Incorporation:</u>  Grupo Antolin incorporates the preceding allegations as if fully set forth herein.

46. <u>Breach:</u>  General Motors has back charged Grupo Antolin for certain damages and charges which directly relate to Milliken's breaches.  These breaches are covered by the aforementioned indemnity provisions of the agreement between the parties.  Milliken has breached its agreement with Grupo Antolin by failing to pay for the aforementioned damages and charges.

47. <u>Damages:</u>  In direct and proximate result of Milliken's breaches, Grupo Antolin has suffered damages including, but not limited to general damages, special and consequential damages, incidental damages, costs and attorney fees.

48. <u>Relief:</u>  Grupo Antolin requests the relief requested at the conclusion of this Complaint.

## RELIEF

Grupo Antolin requests the following relief:

A. <u>Declaratory Judgment:</u>  That the Court declare the terms and conditions and rights and remedies of the parties.

B. <u>Damages:</u>  That Grupo Antolin be awarded its damages including its general, special, consequential and incidental damages, in excess of $700,000.

C. <u>Costs and Attorneys Fees:</u>  That Grupo Antolin be awarded its costs and attorney fees.

    D.    <u>Other Relief:</u>  That Grupo Antolin be awarded such other and further relief as deemed equitable and appropriate under the circumstances.

Respectfully submitted:

**DEAN & FULKERSON, P.C.**

By:   <u>s/Jeffrey L. Hudson</u>
Jeffrey L. Hudson (P31808)
Attorney for Plaintiff
Grupo Antolin Michigan
801 W. Big Beaver, Fifth Floor
Troy, MI 48084
(248) 362-1300
jhudson@dflaw.com

June 30, 2010